DEWITT BAILEY AND HAMMON HARVEY V. THE STATE

No. 7505.   Decided March 28, 1923.

**Burglary—Insufficiency of the Evidence.**

Where, upon trial of burglary, the testimony appeared, as shown by the record on appeal, altogether unreasonable and insufficient to sustain the conviction, judgment must be reversed, and the cause remanded.

Appeal from the District Court of San Augustine.   Tried below before the Hon. V. H. Stark.

Appeal from a conviction of burglary; penalty, two years im-prisonment in the penitentiary.

The opinion states the case.

*D. M. Short & Sons* for appellant.—Cited Williams v. State, 33 Tex. Crim. Rep., 128; Spencer v. State, 52 id., 289; Pauly v. State, 246 S. W. Rep., 375.

*R. G. Storey,* Assistant Attorney General for the State.

LATTIMORE, JUDGE.—Appellants were convicted in the District Court of San Augustine County of burglary, and given two years in the penitentiary.

This is one of the most remarkable and almost incredible cases which has come before this court.   Mr. Hines owned a farm on which was a barn.   The barn had a loft in which, among other things, Mr. Hines had stored a number of cans of vegetables put up by him the preceding season.   The general structure of the barn is stated as being about thirty by thirty-two feet with a hall through the center nine feet wide, one side of the barn being cut up into crib rooms and the other side into stalls, there being two doors swung together and latched in the middle.   Mr. Hines testified in July, 1922, that he closed said doors to the barn on the night of May 2, 1921, fastening them with a one by four latch and also by tying a rope in some manner so it would hold the doors closed.   He tes-tified with no definite recollection but was sure that he closed the doors on the night in question, because it was his custom to close them and fasten them every night.   He had a son seventeen years of age, a couple of practically grown daughters, a tenant who lived

not far away, and a wife. None of these named were used as witnesses by the State. Testifying as to the occasion in question, Mr. Hines did not state whether the doors to his barn were open on the morning of May 3rd or not. He said that some time prior to this date he had observed that he still had about half the number of cans that had been put up, and that not long after said date he had occasion to observe again, and there was only one can left. He also said that they had put up something over one hundred cans. It thus appears that some time between the occasion a few days before May 2nd when Mr. Hines noticed that about half the cans were on hand, and the date a short time after May 2nd when he noticed that but one can was left,—by the agency of some person approximately fifty cans of vegetables had been taken from said barn loft. One J. A. Griffis was the only State witness testifying to any direct criminating fact. The story told by Griffis is remarkable. He swore that he would not be positive about the date, but that he saw these two appellants one night about 12 or 1 o'clock sitting in a ditch right on the road in front of Mr. Hines' barn. That he asked them what they were doing out there at that time of night on the road. His testimony at this point is as follows:

"Dewitt just up and told me,—says 'We are going to steal Jim Hines' chickens.' I stood there and talked with them some little bit and while I was standing there Mr. Harvey's boy come out of the pasture; they said he was down there hunting some chickens that roosted down on the branch. He came on up there and they asked him if he couldn't find any and he said he couldn't and Mr. Harvey then said there were some roosting in the barn, that he could get them; that he knowed where they were, and Mr. Harvey and Mr. Bailey walked over—walked off and left me and the boy standing there on the road and they went to the barn and was gone some little bit and then come back. They didn't have any chickens. When they got up about as close to me as you are (counsel) I guess, I saw Dewitt had something in his arms and he said 'We didn't find any chickens but we give his fruit hell.' He had cans in his arms with something in them. They put them in a sack when they got out to where me and Mr. Harvey's boy was standing, put them in a towsack. . . . That was the first time I had seem them that night, and left them after going about a half mile with them. . . . This was a little over one year ago. . . . Mr. Mitchell lived about one mile from where Mr. Hines' barn was located. . . . It was right about twelve o'clock when I left Mr. Mitchell's. . . . In going from Mr. Mitchell's I traveled in the road by Mr. Hines' house. . . . This barn is located directly on the public road that I was traveling. . . . I don't suppore it was over five minute from the time I stopped there and asked these parties what they were doing there at that time of night and they told me they were out

for the purpose of getting some chickens from Mr. Hines until this boy appeared. . . . This boy and I didn't talk about anything partictularly while they were gone; not anything that I recollect. . . . I stayed right where I was when I walked up there while these parties were gone. . . . When they got to the barn door me and the boy sat down on the road and I didn't see them go in any further than the gate. . . . They were gone something like ten or fifteen minutes. . . . These parties were sitting down in the ditch with their backs against the side of the ditch, just sitting there when I saw them. . . . I said we all went together about a half a mile. We traveled south toward town. . . . We crossed Irish Bayou. We got on the railroad and crossed the branch; that is where we separated. . . . I watched them from the time they came out of the barn until they came back to me. It was about one hundred and fifty feet. Dewitt Bailey had the cans in his arms. I didn't count the number of cans he had. . . . It looked like Dewitt had six or eight cans, something like that. I don't recollect that this other man had any. I did not hear any noise up there like somebody opening the door of that barn while these people were up that way, nor did I hear any noise like they were disturbing any cattle or horses, or run over anything else in the barn. I never saw any light in the barn." No witnesses were introduced by the State except Mr. Hines, who testified as to his ownership of the barn and the loss of his vegetables, and Griffis who testified at length.

The indictment was returned in February 1922, and the case was tried in July following, and the conviction rests upon the above testimony. The testimony appears to our minds to be altogether unreasonable and such as to make us unwilling to incarcerate two citizens of this State in the penitentiary upon same. It appears that without any effort at concealment and without reluctance, if the witness Griffis tells the truth, appellants unblushingly told him that they were sitting by the road side in front of Mr. Hines' barn on the night in question for the expressed purpose of stealing his chickens; that he sat down and talked with them and remained with them apparently to see the outcome of their venture: that when the boy of one of the appellants came from an exploration down in the pasture and reported he could not find any chickens roosting down there, appellants announced their intention of going up to Mr. Hines' barn and stealing some of his chickens. The witness calmly and on terms of friendly intimacy sat down with the son of one of the appellants and waited or watched while they entered the lot and were gone ten or fifteen minutes. He heard no noises and saw nothing to indicate an entry into the barn on their part. He testifies that when they returned one of them had a few cans, the number given above, and that the other had nothing. This certainly is a tremendous variance from the testimony of Mr. Hines that he lost

about fifty cans. Said witness further stated that the defendants openly and frankly told him that they had gotten some of Mr. Hines' fruit, and that they then put the cans in a tow-sack, and that he accompanied them down the road about half a mile and they separated. The record is bare of any showing that this witness made complaint or told anyone of his knowledge of or connection with the transaction at any time. We have no time or inclination to discuss the legal attitude of one who knowingly conceals a crime which was committed in his presence by parties whom he well knew and with whom he went away from the scene of the crime. We content ourselves with repeating that such testimony as we have above detailed is sufficient to stagger credulity. We might further observe that in addition to the fact that the above is the only testimony for the State, appellants introduced in their behalf three young men who testified that some time in the spring of 1921 they were coming from the Bug Tussel church at night and at Irish Bayou they saw the light of a fire, and upon going to it, they found appellants who were there fishing. Shortly afterward, each of the three young men testified, State witness Griffis appeared at the fire with a number of cans which he proceeded to open with his knife, and upon finding that they contained vegetables that Griffis disgustedly said that it was just his luck, that he thought it was peaches, and that he never stole anything in his life that was worth anything; that Griffis cut open the rest of the cans and pitched them in the water and pulled out a pistol and shot at the cans, and then got up and left.

We do not like to reverse cases because of the lack of sufficient testimony, but the condition of this record leaves our minds in such an attitude toward the proposition of the State having sufficiently proven these appellants guilty of burglary by competent and credible witnesses, as that we are unwilling to allow the judgment to stand.

For the reason mentioned the judgment is reversed and the cause remanded.

*Reversed and remanded.*